**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **KEVIN THOMAS,** | ) | |
| | ) | |
| PLAINTIFF, | ) | **Case No: _____** |
| | ) | |
| vs. | ) | |
| | ) | **JURY DEMAND** |
| **TRADEBE TREATMENT &** | ) | |
| **RECYCLING OF TENNESSEE, LLC.,** | ) | |
| **and TRADEBE ENVIRONMENTAL** | ) | |
| **SERVICES, LLC** | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## COMPLAINT

Plaintiff Kevin Thomas ("Plaintiff" or "Thomas"), by and through counsel of record, files his *Complaint* against Tradebe Treatment & Recycling of Tennessee, LLC, and Tradebe Environmental Services, LLC ("Defendant(s)" or "Tradebe"), and alleges as follows:

## I. INTRODUCTION

1.      This is a civil action to make whole the Plaintiff for denial and interference with the exercise of rights guaranteed by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADAAA"), including the right to be reasonably accommodated without interference or retaliation, retaliation for opposition to unlawful actions, and be free from discrimination against him on account of Plaintiff's specific disabilities; said action also brings suit regarding Defendant's violations of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et. seq. ("FMLA"), which prohibits interference with the exercise of rights guaranteed by that statute, as well as the denial and retaliation for the exercise of such rights..

1

## II. PARTIES

2.    Plaintiff at all times relevant to this *Complaint,* resided in Southhaven, Mississippi.

3.    Defendant Tradebe Treatment & Recycling of Tennessee, LLC is a commercial entity incorporated in the State of Delaware, with its principal corporate address at 1433 E. 83rd Ave., Ste. 200, Merrillville, IN 46410-6307. At the time of the events subject of this Complaint herein, Defendant regularly did business in the Millington, Shelby County, Tennessee area and employed more than 50 persons in the said area at the time of the facts that form the basis of this Complaint.

4.    Valid service of process may be obtained on Defendant Tradebe Treatment & Recycling of Tennessee, LLC via its registered agent in Tennessee: Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

5.    Defendant Tradebe Environmental Services, LLC is a commercial entity, incorporated in the State of Delaware and with its principal corporate address at 1433 E. 83rd Ave., Ste. 200, Merrillville, IN 46410-6307. At the time of the events subject of this Complaint herein, Defendant regularly did business in the Memphis, Tennessee area and employed more than 50 persons in the said area at the time of the facts that form the basis of this Complaint.

6.    Valid service of process may be obtained on Defendant Tradebe Environmental Services, LLC via its registered agent in Tennessee: Corporation Service Company, 2908 Poston Ave., Nashville, TN 37203-1312.

## III. JURISDICTION AND VENUE

7.    Plaintiff brings this action under 28 U.S.C. § 1331, alleging the original jurisdiction of this Honorable Court over this private suit to enforce federal civil rights and

employment law protections.

8.      Venue is proper in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. § 1391(b)(2) because the unlawful employment practices occurred within Shelby County, Tennessee, where Plaintiff formerly worked, where Plaintiff suffered the unlawful employment practices and resultant damages, and where Plaintiff would have continued to be employed by Defendant in the absence of its unlawful employment practices.

### IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.      Plaintiff has met all procedural requirements for filing this Complaint, including administrative exhaustion required for jurisdiction in this Court.

10.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission and did so within 300 days of the actions of which he complained. Plaintiff filed his Charges for violations of the ADAAA on October 27, 2021 (Charge No. 490-2022-00179). On or about May 17, 2022, Plaintiff received his *Right to Sue Notices* from the EEOC for the aforementioned Charges and therefore concluded the process of exhaustion requirements with the EEOC. Accordingly, this lawsuit and supporting ADAAA claims are properly and timely filed within ninety (90) days of issuance by the EEOC of Plaintiff's Notices of Right to Sue Letter on May 17, 2022. **(Exhibit 1, "Notice of Right to Sue").**

### V.  STATEMENT OF FACTS

11.     Plaintiff Kevin Thomas was hired by Tradebe in January 17, 2000 to work at the Company's Millington, Tennessee waste management facility.

12.     Mr. Thomas was a Receiving Manager for about 10 years at the Millington facility prior to his termination on or about August 24, 2021.

13.     As Receiving Manager, Thomas was responsible for managing the receiving

operation to ensure it was running appropriately.

14.     In December 2020, Thomas contacted his office manager, Janice Whitely, to ask for assistance and notify her of he was suffering from alcoholism, depression, and suicidal thoughts.

15.     Ms. Whitley, who had experience as a healthcare professional, next corresponded with a mutual friend of Mr. Thomas, who contacted 911 emergency services.

16.     In order to address his conditions described in ¶14, Thomas told Whitely he had sought and was receiving emergency treatment from the Oxford Center, with treatment to continue for about one week.

17.     As a result, Defendant required Thomas to consult with One Source, a health care provider regularly used by Defendant to conduct annual physical tests and fitness for work evaluations.

18.     Due to the Holiday period, Thomas was informed by personnel at One Source that no qualified professional was available to consult with him for several weeks. As a result, One Source directed Thomas to consult with a mental health professional of his choice as a pre-condition to returning to work.

19.     After one appointment, Thomas' counselor, Willie Wells, at the DeSoto Family Medical Center determined Thomas was ready to return to work.

20.     Thomas wanted to continue this counseling service, but was told DeSoto Family Medical Center was not covered by his employee health insurance moving into 2021.

21.      As a result of Thomas' need for treatment in December, Plant Manager Chad Olson was told by Director of Operations Larry Criswell that he "would not let anything linger on like it did with Joe [Festa]."

22.     Approximately two years prior in 2019, Manager Joe Festa suffered from a

mental impairment and resigned from his employment with Defendant following a period of serious illness.

23.     On discovering Festa's mental health impairments, and before Festa resigned, Larry Criswell asked on a conference call, of which Thomas was involved in, "Who are we going to get to replace him?"

24.     On August 2, 2021, Thomas requested and was approved by HR Business Partner Kim Doerner for use of vacation time for the whole week to deal with a personal matter regarding difficulties with his marriage.

25.     On August 6, 2021, Thomas' adult son Cameron Thomas notified HR Business Partner Kim Doerner via text message and a telephone call, that his father, Plaintiff Thomas, was receiving treatment for alcoholism, major anxiety, and depression, and as a result, urgently needed an approved leave of absence from work.

26.     Specifically, during the telephone call on August 6, 2021, Cameron Thomas told Doerner that his father, Plaintiff Thomas, would be hospitalized. At this time, Thomas had worked over 1,250 hours in the preceeding twelve months.

27.     During this call, Doerner provided Thomas' son with the FMLA hotline number and medical insurance details. However, Doener did not send Thomas an FMLA leave request form.

28.     On August 12, 2021, Mr. Thomas' son Cameron Thomas called the hotline to again request FMLA coverage.

29.     On or about August 12, 2021, Thomas was released from Parkwood, an alcohol treatment facility.

30.     On or about August 12, 2021, Thomas notified the employer's HR Business Partner Kim Doerner, and its Health & Safety Manager Mario Murrell, that he was able and

willing to return to work.

31.     On August 11, 2021 Kim Doerner mailed a letter to Thomas. **(Exhibit 2, "Letter from Doerner to Thomas")**.

32.     On or after August 12, 2021, Thomas received the letter from Doerner.

33.     Doerner's letter, referenced in ¶31, informed Thomas of his eligibility to use FMLA leave, and a reasonable accommodation, if necessary, but stated he must set FMLA up "as soon as possible" through Cigna Leave Services and "get your claim processed."

34.     Doerner's letter, referenced in ¶31, informed Thomas of the possibility of using medical leave as a reasonable accommodation, to be further discussed with the employer—specifically, "we wish to speak with you to discuss potential accommodations."

35.     Doerner's letter, referenced in ¶31, also requested medical documentation from a health care provider detailing the reasons he would be unable to work with an expected return to work date.

36.     However, until it received such medical documentation, Doerner's letter, referenced in ¶31, informed Thomas that each day he was absent from work he would be subject to discipline if he did not call his manager prior to each of his daily shifts to report his absence for that day.

37.     Further, Doerner's letter, referenced in ¶31, stated Tradebe considered two consecutive no-call, no-shows as job abandonment.

38.     Doerner's letter, referenced in ¶31, further stated Thomas was a no-call, no-show on August 9 and August 11 – and he would be terminated by the close of business on August 13 for job abandonment if the employer "did not hear from" him.

39.     At this time of Doerner's letter referenced in ¶31, Thomas continued to still possess five days available to him as paid vacation time.

40. Doerner's letter, referenced in ¶31, stated Doerner received a text from Thomas on August 6 stating he, "needed help getting into rehab and insurance information," and her talking with Thomas' son at which time she provided contact numbers for EAP, FMLA, and medical insurance.

41. Doerner's letter, referenced in ¶31, claims Doerner text messaged Thomas on August 10 and August 11 after Thomas did not appear for work on Monday, August 9.

42. As a result of receiving Doerner's August 11, 2021 letter, Thomas called Doerner explaining that Parkwood would not complete his fitness for work paperwork.

43. In August 2021, and several years proceeding this month, it was common practice at Tradebe for its employees to be allowed up to 30 days to return to work following an FMLA qualifying serious health condition.

44. In August 2021, Thomas was not told of any deadline to submit his FMLA paperwork.

45. In August 2021, and prior to Tradebe's termination of Thomas, Tradebe's Employee Handbook did not reference any deadline or time period in which an employee was required to submit FMLA paperwork when an employee is unable to provide advance warning of leave that may qualify as FMLA leave.

46 On August 16, 2021, Doerner told Thomas he would need a doctor to verify he was fit to return to work.

47. On August 17, 2021, Thomas visited his primary physician, who completed the fitness for work paperwork.

48. That same day, Thomas sent a photograph of this paperwork to Kim Doerner and Mario Murrell.

49. On August 18, 2021, Doerner told Thomas he must consult with the

employer's company doctor on August 19 before returning to work.

50.     As a result, on August 19, 2021, Thomas consulted with the employer's company doctor and was again confirmed as fit to return to work.

51.     Thomas then text messaged Doerner and Murrell to confirm he was fit to return to work.

52.     In response to Thomas' text, referenced in ¶51, Doerner only told Thomas she would call him back.

53.     At this time, Thomas was not told to return to work, or about any alleged workplace investigation that included him or how he performed his work duties.

54.     On August 20, 2021, after receiving no update or any direction to remain off work, Thomas personally returned to the workplace to obtain clarification and hopefully return back to work.

55.     Upon his return, on August 20, 2021, Thomas was told by new Plant Manager Mario Murrell that he would not be allowed to return to work until he first spoke with HR.

56.     Murrell told Thomas to return home and expect a call from Doerner.

57.     On August 20, 2021, Doerner called Thomas at about 9:15 a.m.

58.     Doerner told Thomas he was under investigation based on the following allegations against him: (1) his use of the internet while at work; (2) accountability while at work; (3) use of the FMLA system; and (4) his misuse of the payroll system.

59.     The call noted in ¶¶57-58 above lasted just a few minutes.

60.     Doerner asked Thomas for his response to the allegations referenced in ¶58.

61.     Hearing the allegations for the first time, and shocked by such claims, Thomas replied that the questions were so generalized in nature that he had no idea what specific allegations were being made against him.

8

62.    Doerner refused to elaborate or explain the allegations referenced in ¶58.

63.    During this call, Doerner told Thomas he was on suspension pending the outcome of the investigation.

64.    At no time in August 2021 was Thomas asked for any written statement about any claims or allegations about him, his work duties, or the performance of any other employee.

65.    At no time in August 2021 was Thomas provided any written copy of the allegations against him by the employer. Thomas was also not provided any notice that he was suspended.

66.    At no time in August 2021 was Thomas asked any questions in writing by the employer.

67.    In Thomas' 21 years as an employee with Tradebe, no other management employee except for Thomas was suspended by telephone.

68.    On August 23, 2021, Thomas' company cell phone was deactivated by the employer.

69.    On August 24, 2021, the employer mailed a letter to Thomas, signed by Kim Doerner, notifying Thomas of Tradebe's alleged reasons for his termination. **(Exhibit 3, "Letter Regarding Termination").**

70.    On August 25, 2021, Doerner called Thomas and verbally terminated him effective immediately.

71.    In the 21 years Thomas was employed by Tradebe, no other management employee was terminated by telephone.

72.    The employer's alleged investigation into "managerial employees" at the Millington facility resulted in the singular termination of Thomas.

73.     Thomas was not given an opportunity to address allegations by subordinates or alleged witnesses against him regarding his supposed favoritism toward certain subordinates.

74.     Thomas was not informed of any specific claims or alleged facts Tradebe claims to support his termination. Therefore, Thomas was deprived of any chance to properly respond or explain his actions or the circumstances surrounding his alleged actions.

75.     In the several years leading up to Thomas' termination in August 2021, other managers at Tradebe's Millington facility commonly used the internet to view non-work-related materials during work hours.

76.     Tradebe's Millington facility had no policy during August 2021 that prevented management employees from using the internet to view non-work-related materials while at work.

77.     Tradebe's Millington facility had no policy during August 2021 that prevented management employees from using their personal cell phones to view non-work-related internet sources or websites while at work.

78.     No manager at Tradebe's Millington facility except Thomas has ever been subjected to discipline, let alone fired, for the use of the internet to view non-work materials while at work.

79.     No manager at Tradebe's Millington facility except Thomas has been terminated for allegations of favoritism made by subordinates.

80.     The termination letter, signed by Kim Doerner, and mailed to Thomas as referenced in ¶69, notified Thomas that one reason for his termination was "Despite being asked on three occasions, not following and completing Family Medical Leave Act (FMLA) procedures for your own health issues, resulting in each of your FMLA claims being denied."

81.     Thomas' alleged failure to comply with Defendant's FMLA procedures is

false.

82.    Thomas' alleged failure to comply with FMLA procedures is based on Thomas not submitting completed FMLA Certification to Defendant before August 24, 2021 for his absence earlier that same month.

83.    Thomas was not informed by Defendant that he was required to submit his completed FMLA Certification paperwork, or any completed FMLA documents, before August 24, 2021, or he would be terminated.

84.    Thomas was not informed by Defendant of any deadline to submit his completed FMLA Certification paperwork, or any completed FMLA documents.

85.    Tradebe alleges it received an anonymous complaint in mid-July 2021 about poor performance and unprofessional behavior by "managerial employees" at the Millington, Tennessee facility.

86.    Around 2 weeks after receiving the alleged anonymous complaint referenced in ¶85, the employer sent its HR Business Partner to its Millington facility to investigate the allegations made in said complaint.

87.    The anonymous complaint alleged received by Defendant in mid-July 2021 did not reference Thomas' name.

89.    Thomas was not informed about the anonymous complaint allegedly received by Defendant in mid-July 2021 prior to his use of medical leave in August 2021.

90.    Defendant operated cameras at the Millington facility, specifically in Thomas' office and surrounding office space during the months of January through August 2021.

91.    In February of 2021, Director of Operations Larry Criswell called Thomas to ask him questions about Derrick Rehau and informed Thomas that he was watching him from his desk in Chicago.

92.     In March of 2021, Director of Operations Larry Criswell called Thomas to ask him if he was conducting interviews after he had seen him that day conduct a meeting with employee Dennis Long.

93.     Tradebe requested Thomas' browser history on the first or second day of its investigation, August 2-3, 2021.

94.     Tradebe did not request the browser history of any other employee except Thomas on the first day of its investigation.

95.     Indeed, Tradebe did not request the browser history of any other employee except Thomas during its alleged plant wide investigation.

96.      Tradebe requested information regarding Thomas' absence from work on August 2, 2021, on the first day of its investigation.

97.     Tradebe allegedly interviewed 15 employees about the Millington work environment during its investigation.

98.     Tradebe did not interview any employee about the Millington work environment prior to its investigation at the Millington facility on August 2, 2021.

99.     Tradebe claims that of the 15 employees interviewed, "multiple" employees allegedly raised concerns about Thomas' work performance, primarily due to his absence from the receiving area, spending time in his office watching the internet and movies, and showing favoritism to certain employees.

100.    Thomas was not told by Defendant which employees made the allegations against him as referenced in ¶¶ 85 and 99.

101.    Thomas was not told by Defendant which employees made no allegations against him as referenced in ¶¶ 85 and 99.

102.    Thomas was not told by Defendant which employees made supportive

comments about him, his management, or statements contrary to any allegations referenced in ¶99.

103.    Thomas was the only person at Tradebe to be investigated based on an anonymous complaint that asserted problems with "managerial employees."

104.    On August 9, 2021, Tradebe received Thomas' internet browsing history for about the preceding two months, following its request for this information on August 2, 2021. Tradebe did not request the internet browsing history of any other employee except for Thomas.

105.    Thomas occasionally looked at Wikipedia or news media while at his desk, but only during periods he was waiting on information so he could continue his work duties or playing simply for noise while he performed work duties, or during times he was taking a break or eating lunch. At no time did Thomas spend time viewing non-work related websites in lieu of pending work tasks or duties. Further, viewing the internet in the fashion described was common amongst employees at the Millington facility.

106.    Thomas has no memory of the websites referenced by the employer or watching movies while not also performing work duties. Further, to the extent any such websites or movies were opened and remained open, Thomas denies this would have prevented him from continuing with work tasks on the same computer or paperwork on his desk.

107.    Other managers at the Millington facility looked at non-work-related internet sites while at work without incurring discipline from Tradebe.

108.    Defendant's policy "Computer, Internet, and E-Mail Usage" in its Employee Handbook does not state employees cannot view ANY non-work related material on the internet, or generally non-work reading material not available by internet. Rather, the policy

13

sets out several types of non-work internet material that Defendant forbids its employees from viewing during work times. The same policy also sets out twenty examples of actions and activities on the internet that can result in disciplinary action, none of which applies or supports Defendant's allegations against Thomas credibly supports his termination.

109.    Thomas is only aware of one other member of management, Vandal Stewart, to be terminated by Defendant around the time period he was terminated. However, Stewart's termination was due to Defendant's failures to comply with legal environmental standards and inspections made by the Tennessee Department of Environment & Conservation (TDEC).

110.    In the ten years prior to his termination, Thomas incurred no discipline.

111.    In the ten years prior to his termination, Thomas did not receive a verbal counseling.

112.    In the ten years prior to his termination, Thomas did not receive a written warning.

113.    In the ten years prior to his termination, Thomas did not receive a suspension.

114.    In the ten years prior to his termination, Thomas was not placed on probation as the term is used in Defendant's Employee Handbook.

115.    Thomas is the only Millington employee of Defendant who received discipline, of any kind, for his alleged computer/internet misuse.

116.    Thomas is the only Millington employee of Defendant who was terminated for reasons involving alleged computer/internet misuse.

117.    Thomas is the only Millington employee of Defendant who received discipline, of any kind, for alleged favoritism and failure to hold employees accountable.

118.    Thomas is the only Millington employee of Defendant who was terminated for alleged favoritism and failure to hold employees accountable.

119.    At no time prior to Doerner's call to Thomas, referenced in ¶¶57-63 above, was Thomas informed that his work performance was in any way deficient.

120.    At no time prior to Doerner's call to Thomas, referenced in ¶¶57-63 above, was Thomas informed that his work performance was under investigation by Defendant.

121.    Out of the 15 employees Defendant allegedly interviewed on August 2 and 3, 2021, only two of those employees stated or inferred Thomas practiced employee favoritism in the workplace.

122.    Based on its so-called investigation in August 2021, Defendant's investigators suggested the replacing of 4 leaders, including Thomas. In fact however, Defendant only terminated Thomas as a result of its August 2021 investigation.

123.    In the ten years prior to his termination, Thomas received several pay increases, including in the 12 months prior to his termination.

124.    Throughout the course of his employment, Mr. Thomas provided loyal and diligent service to Tradebe.

125.    Prior to his hospitalization in August 2021, Thomas was told by Plant Manager Van Stewart that he "was his top manager."

126.    Indeed, throughout his years as a manager Thomas was regularly required to take on tasks outside of his set job description and expectations, including but not limited to, personally fighting fires and other dangerous chemical reactions that occurred at the Millington facility and for which Tradebe failed to provide him and other employees the full and complete protective gear.

127.    The real reason Tradebe fired Mr. Thomas was because it wanted to prevent and interfere with the exercise of his rights under the FMLA, and the ADAAA, and as a means of needless and unlawful harassment to single-out Mr. Thomas. Further, it wished to

retaliate against him for exercising his rights under the FMLA and the ADAAA.

128.    Tradebe's actions regarding the termination of Mr. Thomas were knowing and intentional, willful, malicious, and/or reckless and were carried out with complete disregard for the consequences of such actions and Thomas' rights under federal law.

129.    Tradebe fired Mr. Thomas to prevent him from using additional medically excused leave or time-off as a reasonable accommodation under the ADAAA, and as an intentional act of retaliation for requesting time off work for purposes of treatment of his disabilities and serious health condition.

130.    On several occasions preceding his termination, but after Tradebe was on notice of Mr. Thomas' diagnosed physical and mental impairments and his need for scheduled medical treatment, Tradebe failed to notify Mr. Thomas that his physical impairments were health conditions that may make him eligible to take FMLA leave to cover any missed days off work.

131.    Mr. Thomas was not made timely aware by Tradebe of his rights or eligibility for FMLA, or to use medical leave as a reasonable accommodation under the ADAAA.

132.    Tradebe's actions and omissions taken against Mr. Thomas, as stated above, are violations of the FMLA and ADAAA, and were knowing and intentional, willful, malicious, and/or reckless.

133.    Mr. Thomas has been deprived of employment opportunities and has otherwise been subjected to Tradebe's interference with and retaliation for using an ongoing accommodation and intentional retaliation regarding his rights under the FMLA, which has caused Mr. Thomas to suffer economic losses including lost wages and benefits, as well as future pecuniary losses, interest, reasonable attorney fees, emotional pain, suffering, inconvenience, mental anguish, including fear for his ability to continue significant medical

treatment and inability to pay related bills, loss of enjoyment of life, and other nonpecuniary

losses and damages, in violation of the ADAAA and FMLA prohibiting retaliatory treatment

and unlawful termination.

## VI. CAUSES OF ACTION

### Count I: Family and Medical Leave Act
### Failure of Notice, Interference with Rights, Denial of Rights, and Retaliation

*Plaintiff repeats, re-alleges, and incorporates the paragraphs above as if fully set*

*forth herein.*

134.    Defendant is a covered employer within the meaning of the FMLA because it

is engaged in commerce, and continuously employed fifty or more employees during **2020**.

135.     Defendant is a covered employer within the meaning of the FMLA because it

is engaged in commerce, and continuously employed fifty or more employees during **2021**.

136.    Plaintiff had worked for Defendant at least ten (10) years prior to his

discharge.

137.    Plaintiff had worked for Defendant at least 1,250 hours within the year

preceding his lawful requests for FMLA leave in August 2021.

138.    Defendant employed fifty or more employees within 75 square miles of

Plaintiff's worksite.

139.    Plaintiff was not a "key employee" for Defendant under the FMLA.

140.    After acquiring knowledge that Plaintiff's leaves of absence may be for an

FMLA-qualifying reason, Defendant did not provide Plaintiff with the statutorily required

notice of his FMLA rights, or Defendant's specific expectations and obligations of Plaintiff,

and an explanation of the consequences of a failure to meet these expectations, within five (5)

business days.

141.    Defendant provided Plaintiff with incomplete, confusing, conflicting and/or false information concerning the use of his twelve weeks of FMLA eligibility.

142.    Defendant's written FMLA notices and other communications were confusing, manipulative and/or coercive, and caused Plaintiff to be denied the exercise of his rights under the FMLA.

143.    Defendant willfully violated Plaintiff's rights under the Family and Medical Leave Act and willfully manipulated, interfered with, restrained, retaliated against, and denied Plaintiff the exercise of rights provided by the FMLA and its implementing regulations.

### Count II: Americans With Disabilities Act (As Amended)
### Failure to Accommodate, Interference, Retaliation, and Disparate Treatment

*Plaintiff repeats, re-alleges, and incorporates the paragraphs above as if fully set forth herein.*

144.    The ADA Amendments Act of 2008 (ADAAA) applies to Plaintiff's ADA claims of its failure to accommodate, its interference, its retaliation, and its wrongful termination of Plaintiff, because those actions took place on or after January 1, 2009. Pub. L. 110–325, § 8, 122 Stat. 3553 (Sep. 25, 2008), codified at e.g., 42 U.S.C. § 12101 *et seq.*

145.    Defendant(s) conduct, as alleged in the numbered paragraphs above, is in violation of Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12101 *et seq.* Specifically, said violation(s) occurred as a result of Defendant's multiple failures, after receipt of medical documentation or information that detailed related work restrictions and physical and mental impairments, to grant Plaintiff's requests for reasonable accommodations pursuant to the ADAAA; Defendant's multiple failure(s) to engage in an interactive process, in good faith, with Plaintiff on how to implement or effect appropriate reasonable accommodations, including but not limited to Defendant's unilateral

termination of an ongoing reasonable accommodation (medical leave) and termination of Plaintiff, which was unreasonable and unlawful on its face. Plaintiff was also regarded and known by Defendant to have actual and recorded disabilities pursuant to the ADAAA and suffered disparate treatment as a result of his specific impairments.

146.    Defendant's conduct, as specifically alleged in paragraphs above, constituted violations of Plaintiff's rights under the Americans with Disabilities Act (as amended), 42 U.S.C. § 12203(a)-(b). Specifically, said violation(s) occurred as a result of Defendant's retaliatory actions against Plaintiff following his request and use of medical leave and previous requests for medical leave as a reasonable accommodation in August 2021 pursuant to the ADAAA; and, Defendant's interference with Plaintiff's right to engage in an interactive process, in good faith, on how to implement or effect appropriate reasonable accommodations; and, Defendant's unreasonable termination of Plaintiff on or about August 24, 2021, another act of retaliation under the ADAAA.

147.    At all relevant times, Plaintiff was a "qualified employee" pursuant to 42 U.S.C. § 12111(8) of the ADAAA.

148.    At all relevant times, Defendant was a "covered" employer pursuant to 42 U.S.C. § 12111(5)(A) of the ADAAA.

149.    Plaintiff was regarded and known by Defendant to have actual, and recorded, physical and mental impairments that were long-lasting or permanent in nature and substantially limited Plaintiff in several major life activities, including but not limited to performing exercise, fatigue, difficulty sleeping, stress tolerance, and without medication and/or treatment maintaining concentration or cognitive tasks as compared to what the average person is capable of doing.

150.    Defendant also unlawfully discriminated against Plaintiff because he was regarded as, and, known to be actually and recorded as disabled by Defendant pursuant to the definitions provided in the ADAAA.

151.    Specifically, Plaintiff was replaced by a person who Defendant believes not to suffer from a disability as defined by the ADAAA.

152.    Further, Defendant's harassment of Plaintiff while he underwent treatment for his known physical and mental impairments, and his subsequent termination as a means of preventing him from returning to work, was unreasonable and unlawful, and penalized him for previous and prospective medically excused time off work or leave taken as a reasonable accommodation, making his ongoing medically excused absences or leave an ineffective accommodation without providing substitute reasonable accommodation alternatives, thus unlawfully retaliating against Plaintiff and interfering with his exercise and enjoyment of rights granted under the ADAAA.

## VII.  PRAYER FOR RELIEF

*WHEREFORE, Plaintiff respectfully prays that this Honorable Court:*

A.    Declare and adjudge that Defendant violated Plaintiff's rights under 29 U.S.C. Section 2601 *et. seq.*, and 42 U.S.C. § 12101 *et seq.;*

B.    Reinstate to Thomas to his former position of employment;

C.    Order Defendant to immediately cease and desist from all retaliatory and discriminatory behavior as described in this complaint;

D.    Award Plaintiff nominal damages;

E.    Award Plaintiff compensatory damages, including appropriate back-pay, based on an annual salary of $67,200.00 plus benefits, and including but not limited to, unpaid social security quarters, bonuses, and contributions to any applicable 401K or similar

retirement account;

F.      Award an amount to offset additional tax liability incurred by Plaintiff for any award of back-pay which he would not have incurred had he received pay and benefits from Defendant in the regular course of employment;

G.      Award Plaintiff compensatory damages, including emotional pain and suffering;

H.      Award Plaintiff liquidated damages;

I.      Award all out-of-pocket expenses and debts incurred by Plaintiff, including the regular and desperately needed monthly costs for medical treatment, other unpaid medical bills incurred, and any loans needed to sustain basic living requirements and child care;

J.      Award Plaintiff punitive damages;

K.      Award Plaintiff the costs of this action and reasonable attorney's fees;

L.      Award Plaintiff pre-judgment and post-judgment interest on the foregoing sums;

M.      Award Plaintiff such other relief as the Court deems just and proper, including the award of costs and fees.

## VIII. TRIAL BY JURY

Plaintiff respectfully demands a trial by jury on all issues.

Respectfully submitted,

s/ Steve Wilson
Steve Wilson, BPR#28460
The Steve Wilson Firm
5100 Poplar Ave., Ste. 2700
Memphis, TN 38137
Tel: 901-337-1300
Fax: 901-372-1446
steve@stevewilsonfirm.com

s/ Matt Gulotta
Matt Gulotta, BPR#28194
The Gulotta Firm, PLLC
202 Adams Ave.
Memphis, TN 38103
Tel: 901-213-6648
Fax: 901-424-1296
matt@gulottalaw.net